We'll hear argument next in Case 21-309, Southwest Airlines v. Saxon. Mr. Dorefsky. Mr. Chief Justice, and may it please the Court, Section 1 of the FAA exempts only classes of workers that work on an instrumentality of foreign or interstate commerce, like a plane, ship, or train, as it moves goods or people across borders. That rule follows from Circuit City held that the exemption reaches only classes of workers engaged in foreign or interstate transportation. As then-Judge Barrett held in Wallace, that means an exempted class of workers must perform work analogous to that of seamen and railroad employees. Seamen and railroad employees' key characteristic was working on ships and trains. We know that because seamen was a term of art. It meant workers who predominantly worked on a vessel. Vessels, by definition, transported or were capable of transporting goods or people over water. And the paradigmatic seamen, as the Court noted in Chandris, sailed long voyages. That made seamen as a class actively engaged in foreign or interstate transportation. Critically, seamen did not include land-based maritime employees. By specifying seamen, Congress excluded stevedores, who are land-based cargo loaders. Now, Saxon says the exemption covers the entire airline industry. But Section 1 exempts classes of workers, not industries, engaged in foreign or interstate transportation. It says seamen, not maritime employees. It repeats foreign or interstate, emphasizing border crossing. And placed among these other words, railroad employees similarly means workers who perform their duties on the train. Saxon is not exempt from the FAA. Cargo loaders don't work on planes, just as stevedores didn't work on ships. They load cargo before other classes of workers, like seamen and pilots, do the foreign or interstate transportation. They may facilitate transportation, but that's not the test Circuit City requires. I'm happy to take the Court's questions. Counsel, in your brief and in your opening here, you seem to be very, being very precise in one of your phrases. You say emphasizing border crossing in determining interstate commerce. Does your test require that the worker who wants to be covered actually cross the border? No, it does not. The question, as then Judge Barrett explained in Wallace, is whether movement of people or goods through the channel of interstate commerce is central to the job of the class of workers. So you might have a particular worker within that class who, on a particular day, doesn't cross borders. But the question is whether border crossing and this kind of transportation analogous to what seamen and railroad employees did is central to the job of the class of workers. Okay. So what you're saying is you might have a worker in a particular function who doesn't cross the border, but if the other people on his team do, then it's okay? Well, I think in that hypothetical, Mr. Chief Justice, it depends on whether your hypothetical worker is in the same class of workers as the others on the team. When you're talking about a class of ramp agent supervisors, they all have the same job description. And their job description doesn't involve getting on the plane. Well, let's say it's a group, but only the most senior members of the group are the ones that do the actual border crossing. And then the others have to have put in three or four years at the junior position that isn't crossing the border, but then they'll eventually be on that. I'm trying to figure out, when you say emphasizing border crossing, exactly what you're trying to sweep under the rug. Sorry. I don't mean that in a pejorative sense. I think when Congress emphasized border crossing by repeating the words foreign or interstate before commerce. And so the particular type of commerce that is at issue has to involve border crossing of the sort, again, that seamen and railroad employees did. You might have some seamen who didn't cross borders, but if the class is... But they would be covered. They would be covered. They would be covered. And as for why that makes sense, this is like the dull knives point that Judge Bress made in dissent in the Ninth Circuit. Knives as a sharp, as a class, are sharp. You might have a dull knife. It's still a knife. You might have a seaman that doesn't cross borders, but because the central characteristic of seamen is to travel on ships and to do so typically across borders, that's what satisfies the Section 1 exemption. And so when we're looking at another class of workers, like is analogous to that. Thank you. That's very helpful. Counsel, I see your main argument, and you've repeated it again today, is that stevedores weren't considered seamen, but cargo loaders were considered railroad workers. And in New York, what happened was that there were special arbitration proceedings with respect to railroad workers and seamen. Why isn't it Longshoremen, the Longshore Harbors Act, has workers' compensation for stevedores? So it would have surprised me for Congress to have mentioned the seamen and stevedores in that list of two transportation workers, because stevedores weren't even in the arbitration realm. Is that correct? So why don't I look at what was within the definition of railroad workers, which included cargo handlers? Justice Sotomayor, I think that the term railroad employees read in isolation, not in the context of Section 1, could include cargo loaders, but it doesn't have to. And so when there are competing... Well, stevedores are a part of commerce, we said, in Puget Sound, as much as the crew on the train. So cargo handlers on the railroad are equally part of transportation commerce. So I don't see the difference. But I don't think that the Commerce Clause cases like Puget Sound are really instructive for the question here, for a couple of reasons. One, in Puget Sound, the Court was relying on Haverty for the notion that seamen included stevedores. Haverty, as this Court later recognized in Chandris and Willander, was wrongly decided. And as the Court reiterated in Chandris and Willander, the fundamental characteristic of seamen is predominantly spending time on the ship. And as the Court noted in Chandris and Willander, in Haverty, which again is the case that Puget Sound relies on, the Court was using seamen not in its common understanding to include stevedores. In addition to that, Puget Sound relied on Birch, which is a FELA case. And FELA, for a number of reasons, is not instructive here as well. The statutory text is different. The decisions interpreting FELA were, by their very terms, atextual and rather purposive, looking at the broad purpose of FELA. The phrase is, except for workers engaged in foreign and interstate commerce. If we define cargo handlers as involved in interstate commerce and seamen and offshoremen were also considered involved in commerce, maybe not interstate because there's no question most ships, not all, but virtually all travel in interstate commerce, why doesn't the same apply here? But cargo handlers do as well. Because the commerce cases like Puget Sound are not answering the same question that is at issue here. They are not interpreting the statutory term engaged in foreign or interstate commerce, which, as this Court said in Circuit City, is a term of art. They are also in a they are answering a different question. They're talking about what is the full extent of Congress's commerce power and how does that interact with the State's authority? The Court said in Circuit City that the scope of Section 1, the Section 1 exemption, does not reach the full extent of Commerce Clause power. That's simply the wrong question under Circuit City. And so when the Court is saying in these cases like Puget Sound that stevedores are a part of interstate commerce, they're doing so in a very different context that's not instructive here. Counsel, let's say I agree with everything you just said, but I still have a question about folks who unload cargo from interstate commerce and bring it into the State. What evidence is there that railroad workers who did that were or were not covered by this statutory language? And if they were covered by it, do you lose? Well, if I may just clarify the question. When you're asking if they're covered by the... You can try. If you're asking about the statutory language, you're referring to whether they are covered by the Section 1 exemption? Yes. Okay. So, again, railroad employees, if you just read it in isolation, could mean any number of things. I know you like to talk about people who travel, okay? And I'm saying put that person that's come in interstate commerce from the railroad and then hands it off to a carrier locally, that person. And if that person was exempted by the Act, then why isn't the same person unloading cargo from a plane in the same position? Justice Gorsuch, I don't think that person was exempted by Section 1. That's my question. That's why I wanted to... What evidence do you have of that? So that's why I wanted to clarify exactly what statute we're talking about. I don't think that person was exempted by Section 1 because railroad employees can be used any number of different ways. And if you look, for example... I understand that. I'm talking very specifically and historically. In 1925, what evidence do you have? I would look at the Hours of Service Act and the Boiler Inspection Act. I would look at the Erdman Act. These are all statutes in which Congress used railroad employees to mean something less than everybody who works for the railroad. Likewise, in United States v. American Trucking... Do those things specifically deal with the class of workers I'm talking about? Or are they just acknowledging that, of course, the back office accountant sitting in New York is not engaged in interstate commerce? Well, I think those statutes are actually narrowing the class of railroad employees to exclude far more than just the back office accountant. I'm talking about the very particular class of workers that we have at issue here. And what evidence do you have? One way or the other, with respect to them. Not other people who do other functions that have nothing to do with interstate commerce. Well, I don't think we have either evidence or a definition either way as to Section 1. What we have, though, is statutory context in which the term railroad employees, first of all, can be used to mean less than all railroad maritime employees. So that shows us that Congress was not trying to exempt everybody who works for a particular employer, but rather a specific class. We have engaged in foreign or interstate commerce, which, as this Court said in Circuit City, colors the understanding of seamen and railroad employees. We also have the language class of workers, which suggests, again, that we are focusing on what workers do, namely the workers in particular have to be engaged in foreign or interstate commerce rather than sweeping... And I'm going to take all that as no. I don't have any evidence of the past, unless I'm misunderstanding something. And then I'll ask you this question, if that's the case. Why wouldn't we naturally understand someone who is loading and unloading cargo from interstate commerce to be involved in interstate commerce within the meaning of this act, narrowly, as a class of persons? Because such an individual, that would be a sweeping interpretation of Section 1. Well, you can call it sweeping, you can call it narrow. Whatever adjective or adverb you want to attach to it, why wouldn't that be an appropriate reading of the statute, counsel? Because the statutory structure and text here suggests that Congress had in mind a narrower understanding, based on all of the other cues that we are talking about. If Congress meant... Railroad employees can be read one of two ways. Seamen can only be read one way. And so, therefore, the understanding of seamen ought to help the Court understand which understanding of railroad employees is the right one. In Neal v. Clark, for example, the Court looked at the word fraud. Fraud, standing on its own, can mean either positive fraud or implied fraud. The Court read it to mean positive fraud because it was used in the statute alongside the word embezzlement. What do you do with... Keep going, sorry. Keep going. I was just going to say, so to hear, railroad employees can be read either way in isolation, but should be informed by seamen. And on workers engaged, class of workers engaged in foreign or interstate commerce, what do you do with the Birch case, which I realize is about FILA, but is dealing with similar language engaged in commerce? And the Court said, quote, it is too plain to require discussion that the loading or unloading of an interstate shipment by the employees of a carrier is so closely related to interstate transportation as to be practically a part of it, end quote, which was applying, of course, as you know, the Shanks test, closely related test to reach a conclusion. And that's 1924 when the Court says that. So what do we do with that? So two points, Justice Kavanaugh. One textual, the other methodological. Let me actually start with the methodological point. You mentioned Shanks. In Shanks, the Court said that it was interpreting FILA not in a technical legal sense, or it was interpreting interstate commerce, not in a technical legal sense, but in a practical one better suited for the occasion. Shanks by its terms is not a textual opinion. It's a purposive opinion. Right. So we're left, I mean, I don't know if you listened to the last case, but a similar situation where the Court has a precedent interpreting the language and the questions whether, I think, whether we should think that precedent makes sense with the exact or very similar language in another contemporaneous statute. I guess I'll let you keep going on that. Well, so Shanks took one methodological approach, which was an atextual one. At the same time, in Circuit City, the Court said the way to think about engaged in foreign or interstate commerce is with reference to the Gulf Oil and ABM cases, which rejected the kind of closely connected standard that Shanks adopted. In addition to that, I said I had two points, but that's the methodological. The textual differences between FILA and Section 1 are also important. Obviously, FILA does not have the kind of language that we have in Section 1 about seamen and railroad employees in a residual clause. It doesn't use the words foreign or interstate commerce in the same way. It talks about a common carrier engaged in trade or commerce. Between any of the several states? Right, but it doesn't have the same – And that sounds like interstate. It's not the same repetition of foreign or interstate that we have here in the residual clause. In addition to that, FILA focuses first and foremost on the employer's business. It talks about every common carrier by railroad while engaging in trade, focusing on the employer in a way that the Section 1 exemption is not. And lastly, when FILA gets to employees, it talks about them in their individual capacity, whereas the FAA addresses classes of workers. So textually, there are a number of differences here. And methodologically, again, when the Court was looking at FILA, it wasn't doing so textually. It was doing so in a purposive way. And Gulf Oil and ABM, which also interpreted contemporaries of the FAA, using language like engaged in foreign or interstate commerce, they had a much narrower understanding of what those words meant. But it's also interesting the Court just says it's too plain to require discussion, that loading and unloading is, you know, it's like so obvious to the Court in 1924 that loading and unloading is practically part of the interstate commerce. That suggests an understanding of the terms as of 1924. Only in the context of a test that itself said that FILA was so broad that it covered a vast field about which there can be no discussion. That's a quote from the Carr test. And if you want to look more directly to the FAA, what do we do about warfage, which Section 1 speaks about as agreements relating to warfage or any other matter in foreign commerce? Warfage contracts, as I understand them, not being an expert in this area, have to do with the loading and unloading of cargo. And if that is considered interstate or in foreign commerce for purposes of Section 1, what do I do about that? That seems a rather specific textual clue. So the reference to warfage comes up in the definition of maritime transactions, not in the definition of commerce. Congress in Section 1 was separating out maritime. It says warfage or any other matters in foreign commerce. That's what it says. It does, but it says that in the first part of Section 1 defining maritime transactions. I understand that. Before it gets to commerce. But it considers a warfage agreement to be a matter in foreign commerce. Do you wish to address that? I do, and I disagree with that grammatical understanding of the statute as well, because if you look at everything that comes, if you look at the words that come after warfage, for example, supplies furnished vessels or repairs to vessels. Or any other matters in foreign commerce. Supplies furnished vessels or repairs to vessels are not something that you can think of as being in foreign commerce, which suggests that in foreign commerce is really just modifying matters rather than characterizing everything that came before. It doesn't make sense to think of a repair to a vessel as being in foreign commerce. And if it did, what would that mean? That everybody somehow associated with the repair by virtue of repairing a vessel was in foreign commerce? That's a pretty sweeping understanding of foreign commerce. I understand your point. Contrary to what Congress was doing when it actually got to defining commerce, by specifying seamen, by repeating foreign or interstate where it didn't need to in order to underscore the significance there of border crossing. Picking up on the question on railroad employees that Justice Gorsuch was asking, I think your theory is that because seamen doesn't include everyone involved in shipping, I think we should interpret railroad employees not to interpret everyone who's involved in loading and unloading the railroad, the cars as well. That is part of it, yes. And why not just read railroad employees to mean railroad employees? Well, so first of all, railroad employees doesn't have to mean all railroad employees. And, in fact, it typically doesn't. Even in the RLA, when it refers to employees, it's not talking about everybody who works for the railroad. Management is excluded. The RLA and the Transportation Act both distinguish between employees, subordinate officials, and management. And so just looking at the term railroad employees, the most natural reading of that isn't everybody who works for the railroad. And are you acknowledging that if railroad baggage handlers are covered, then you lose? There's no way to separate those two out, is there? I think there is a way to separate those two out. Even if railroad baggage handlers are covered, that doesn't tell you that Congress meant to exempt the entire airline industry. Well, I mean, we may or may not be talking about the entire airline industry, but at least airline ramp workers and airline ramp supervisors. If railroad baggage handlers are covered, is there any possible way that airline ramp workers would not be covered? Yes, absolutely, because even if you ask me to assume that railroad baggage handlers are covered, we still have the fact that stevedores are not covered by use of the word seaman. And so at that point, we look at those two words, and maybe they point in other directions, but how do you resolve that? You still look at engaged in foreign or interstate commerce, which under Circuit City is supposed to be given a narrow construction. You still look at the fact that the Section 1 exemption is focusing particularly on what the workers do rather than on the employer more generally. And in addition to that, you ought to interpret the Section 1 exemption consistently with the FAA's pro-arbitration purposes. There's no reason to think that when Congress passed this statute in 1925 that it meant to leave a gap to cover a class of workers that would not be covered by any other Federal regime for years later. Didn't we say not to do that in New Prime? I thought that that was one of the points of New Prime, is that you don't get to just wave around the FAA's purposes in order to construe the scope of Section 1. I think you don't get to use the FAA purposes to contradict the plain language of Section 1, but here I think that the language of Section 1 supports us and would be informed by the broader understanding of what Congress was trying to achieve in the FAA, which was to promote rather than undermine arbitration. The purpose of the Section 1 exemption that the Court attributed to Congress in New Prime and Circuit City was not an anti-arbitration purpose. It was a purpose to make sure that the vast majority of individuals are covered by Section 2, and to the extent there's an – Right, but whatever the FAA's general purposes are, we read the exception fairly. Isn't that the proper way to read a statute? There are – there's a general – there are general provisions, and then there's an exception, where they thought that the general provisions of the FAA did not apply, and we read that exception fairly. Isn't that what we're supposed to do? Of course, but I would submit that it's not a fair reading of the exception here, where you have a choice between two competing interpretations of railroad employees in this context to choose the broader understanding of railroad employees. Given, again, the juxtaposition with seamen, given, again, the focus on engaging in foreign or interstate commerce, and the understanding that Circuit City attributed to that term in this very statute to require direct participation in the movement of goods or services. And, again, when we're looking at what seamen did, I don't think you can just look at railroad employees and ignore what seamen did. I think you have to look at them together. And then with respect to the argument, which we may hear, that the entire airline industry is covered by this, again, the statute here doesn't speak in terms of entire industries. It speaks in terms of classes of workers and a focus on the work that they do, and, again, juxtaposing railroad employees with seamen. Thank you. Justice Thomas? Thank you, Mr. Chief Justice. Just a couple of questions. You make quite a bit. You suggest that the seamen have to actually travel interstate or internationally, right? I think seamen as a class, the only understanding of that class is that they traveled interstate or internationally. But as I was trying to explain to the Chief Justice at the beginning of the argument, you could have an individual seaman who didn't, yet that person would still qualify as a seaman and fall under the exemption. Well, how would you do that? You would look at the class of workers that the individual belongs to. And if the class of workers is that of seaman, then you look at the traditional maritime law understanding of what a seaman was. And cases like Chandris and Willander tell us that the fundamental characteristic of seaman as a class was working on the vessel and typically crossing borders. But that doesn't mean that if you have an individual seaman who didn't cross borders that they're excluded from the exemption. So let's just look at tugboat operators as a class. Would they be considered seamen? I think they would. Why? They don't travel internationally. They don't, but nonetheless, they satisfy the basic conditions for the test under Chandris and Willander. They spend the predominant amount of their time on a vessel, and the vessels that they spend time on move or are capable of moving people or goods across water. The fact that they don't do so internationally doesn't exclude them from the class of seaman, given what the definition is for seaman under this court's case law and under maritime law. Okay, give me again your limiting principle for railroad employees as a class. Railroad employees are those who ride the rails. They're the people on the train who move goods or people on the train. Typically that's going to be across borders, but as with the discussion we were just having about seaman, you could have railroad employees who don't cross borders as well. So there used to be a train that ran just from Savannah to Atlanta and back. Now it's a railroad. It's a train. It has employees. So I'm trying to understand why the employees on that dedicated intrastate train would be treated differently from your class of either internationally traveling or interstate traveling employees. Justice Thomas, because the employees who work on the train between Savannah and Atlanta are not their own class. The class of workers is still railroad employees, and typically railroad employees cross borders, but there are some, as in your example, who don't. That doesn't make them part of a different class. So you're basically saying you have a definition of a class that includes international or interstate travel and that you may have exceptions to that. Isn't that kind of an odd way to create a class? I don't think it is because I think that's what follows. It would be the opposite. That's what I'm asking, that the class is broader than those who travel internationally or nationally. I think I would point you again to the use of the word seaman in the statute. Seamen sometimes cross borders and sometimes didn't, but Congress in the statute didn't distinguish between those different types of seaman. It just talked about seaman as a general class. And so when you're talking about railroad employees, you're also talking about them as a general class, whether the particular railroad employee goes from D.C. to New York or from Atlanta to Savannah. So one last question, and this is back to what Justice Gorsuch alluded to, and that is warfage. I'm having some difficulty understanding your argument there, because that seems to suggest that as a part of the maritime transaction that we're talking about, it would include warfage agreements, basically shore agreements. I don't understand what your answer was to him. Justice Thomas, I think the answer is that warfage is part of maritime transactions, but Section 1 separately defines maritime transactions from commerce, and the Section 1 exemption that we're talking about here today is an exemption from the definition of commerce, not from the definition of maritime transactions. Okay, finally, let's just move away from warfage a second. What would you do with dreyage that continues the journey of, say, a container from the airport, if it's FedEx, UPS container, or if it's intermodal and it comes in on a container ship, but then it's taken 200 or 300 miles away? Well, I think if it came in on a ship, at that point you could conceivably fall within the definition of seamen. The dreyage would be considered a seaman? I think it would if we're talking about moving across water. No, a dreyage would be moving to a truck to be hauled. Oh, oh, oh. So, no, that would not fall within the Section 1 exemption. That would not fall within the Section 1 exemption because it is not part of what the seamen's duties. Well, it would depend, I suppose, who's doing that work. If you have the seamen who are actually the ones unloading the ship, then I think the fact that they carried out some loading or unloading duties would not take them out from the exemption. But if you have individuals analogous to ramp agents or stevedores whose primary job it is to be unloading the ship, then no, under the language of Section 1, they would not be subject to the exemption, just as stevedores were excluded from the class of seamen. Thank you. Justice Breyer? Justice Leib? Justice Sotomayor? Justice Kagan? Railway signal operators, are they railway employees? Not within the meaning of Section 1 because they're not riding the train. So, I mean, you know, the train doesn't go unless those signal operators are there going green light, red light, right? But they're not railway employees within the meaning of Section 1? Correct, because the test is not how closely related or even how necessary they are to transportation. The test under Circuit City and under the language of Section 1 is whether they actually are doing the foreign or interstate transportation in the way that seamen and railroad workers do. Lots of different people are important for transportation. You might need a travel agent to book your ticket. You wouldn't get on the plane if you don't know how to use a computer without the travel agent. That doesn't mean that the travel agent is a transportation worker just because they were necessary for you to get on that plane. So the test is are you moving? The test is are you moving on the ship, the plane, the truck, through the channels of interstate commerce. That is what seamen and railroad employees did. Justice Gorsuch? Justice Kavanaugh? I mentioned the Birch precedent, but the other side cites a number of other pre-1925 cases like Gloucester, Ferry, Crutcher, Easton, Texas Transportation in other fields, but in all of them suggesting that loading and unloading is part of interstate commerce. So I don't necessarily want you to go one by one, but just what's your response to that? And they say that just reflects, further demonstrates the common understanding that loading and unloading is part of interstate commerce. So I think those cases were answering a different question. They were not interpreting engaged in foreign or interstate commerce, which the court said in Circuit City was a term of art that has to be given its plain meaning. Many of those are dormant commerce clause cases. So what's going on in those cases is the court is saying a state, let's say, can't regulate the loading or unloading of cargo, because without the loading or unloading of cargo, the interstate commerce can't happen. And so in that situation, regulating the loading or unloading is stopping the interstate commerce from happening. That's simply answering a different question than whether the people doing the loading or unloading are themselves engaged in foreign or interstate commerce in the narrow way in which Section 1 uses that term. Thank you. Thank you, Counsel. Ms. Bennett. Mr. Chief Justice, and may it please the Court, if Congress wanted to exempt from the FAA just those workers aboard an instrumentality of commerce crossing state lines, it easily could have said so. Instead, it excluded the employment contracts of seamen, railroad employees, and any other class of workers engaged in foreign or interstate commerce. This Court made clear in Newprime that we interpret this exemption just as we would any other statute by the meaning of its words at the time it was passed. Those words exempt airline employees who load and unload cargo. Southwest can't dispute that by 1925 it was black-letter law that the transportation of goods in commerce begins when they're given to a carrier and it only ends when they're received at their final destination. Indeed, this Court had repeatedly held that loading and unloading cargo specifically is part of that transportation, not ancillary to transportation or connected to transportation, but it is itself transportation, that it is itself commerce. And just the year before the FAA was passed, as Justice Kavanaugh pointed out, this Court held that it was too plain to require discussion that a worker who unloaded a train was a railroad employee and that that railroad employee was engaged in interstate commerce. Yet Southwest contends that workers who load and unload airplanes are not part of any class of workers engaged in commerce for purposes of the FAA. There's no support for this contention in the text of the statute. Southwest can't point to even a single example from any time period in which the phrase engaged in foreign or interstate commerce has ever been given the meaning it proposes. So instead, Southwest invokes the statute's purpose. The FAA favors arbitration, Southwest says, so the exemption must be given as narrow a reading as possible, regardless of what the text actually means. But this Court rejected that very argument in New Prime. And even if we were to privilege purpose over text, on Southwest's interpretation, the exemption would do exactly what Circuit City held it was designed to avoid, unsettle developing and existing dispute resolution regimes at the time. I welcome this Court's questions. What about ticket agents? Are they included as transport workers under your approach? Yes, Your Honor. In 1925, and by ticket agents I assume you mean people who work for the airline helping passengers. The person you go up and give your ticket to. Yes, Your Honor. In 1925, those people certainly would have been railroad employees. If you look at, for example, decision number two of the Railroad Labor Board, which is the agency that set wages for railroad employees at the time, you'll see those people listed in the list of employees. Station employees were certainly included. What about somebody who actually doesn't take your ticket, doesn't put the little, you know, thing on the bag, but is there at an office for the airline in the airport? I think it would depend on what that person is doing. But what we know about railroad employees, the ordinary meaning, was those people who did the customary work of the railroad at the time. And what that meant was that anybody whose function was contributory to the transportation of the railroad rather than, say, negligible or tenuous. Or the general counsel. His work is, whatever you just said, supportive of the transportation or whatever. The general counsel is likely not a railroad employee, and the reason for that is because railroad employees excluded executives. There was really this, as Mr. Dvoretsky pointed out, there is a labor management divide just as there is in any other class of workers. And so for that reason, the general counsel likely wouldn't be excluded. In your answers to the Chief Justice, you have two arguments, alternative arguments. Are you distinguishing your broader all-airline workers from your narrower argument? Or am I misreading how you constructed your argument? I think even if the, on the broader argument, what we mean by airline employees is a category analogous to railroad employees. Right. So on your narrower argument, maybe you can tell me what your narrower argument exactly is as you would articulate it. Sure. So the narrower argument is that cargo loaders were engaged in foreign or interstate commerce in exactly the same way as seamen and railroad employees. And if we start with the phrase engaged in commerce, we know that in 1925, people who loaded and unloaded railroad trains were engaged in foreign or interstate commerce. So on your, sorry to interrupt, but on your narrow argument, just to follow up on the Chief Justice's questions, on your narrow argument, does that bring in then the gate ticket agents, or is that a question for another day, or where does that stand? On the narrower argument, I think that's a much more difficult question. And the question would be, you know, the narrower argument would be, are those people engaged in foreign or interstate commerce? If we take the class of workers as the job you're doing, then we would look at the flow, I think we would look at the flow of commerce. And for passengers, that really started when they got to the airport and ended when they got to their destination. So likely, even on the narrower argument, I would say that ticket agents, people who take your ticket when you get to the airport, are probably. But we could leave that open. But absolutely, you could leave it open. That's a much more difficult question than cargo loaders, and we know that cargo loaders are engaged in commerce in 1925 because this Court said so. Can I ask you, though, you say arrive at their final destination. You've said that a couple of times now, and that brings to my mind, and we have a lot of amici here from, like, Lyft and Uber, and Justice Breyer referred to them. I can understand in 1925 that someone who unloaded a ship might have been involved in, engaged in commerce. I understand the narrower version of that argument. I can get my head around that. I'm not sure I can get my head around it. Maybe you can explain to me whether you think that necessarily includes the last mile from the dock, from the rail yard to the consumer. Can you help me there? Sure. So in terms of Lyft and Uber specifically, you know, what this Court said in, for example, United States v. Yellow Cab, and what it says in Knight as well is that the customary understanding of transportation by railroad, by boat, by plane, is that it ends by final destination for passengers. It ends at the station, your final station, and that the local taxi service afterwards was typically not understood as included in that transportation. And so it's different than, for example, you know, there were last mile drivers of goods. There were last mile railroad workers who took goods on the railroad for the last mile of the journey. This Court has a case called Hancock, for example, that deals with last and first mile railroad workers. And in that case where the last mile is part of a continuous journey, what this Court held is that that last mile, even though it's entirely interstate, is still part of the continuous journey. So for workers like Lyft and Uber and other kinds of sort of last mile drivers, what the question would be is, is it part of this continuous journey in the same way that the railroad worker in Hancock was? Or instead, is it really a separate sort of local kind of transportation? And that's how I would address that. And then seamen, help us out with that. Sure. That is your friend on the other side's strongest argument, that seamen were people who rode the waves and did not include stevedores. And we need to take cognizance of that fact. So two things on that. First is the Euston Generous Analysis is telling us we're looking for a commonality. So we're looking for what is the same between seamen and railroad employees. And at the very least, we know that railroad employees were not necessarily people aboard a vessel. Take the signalman, for example, the cargo loader in Birch, in Rhodes, the station agent. And so that can't be a commonality between seamen and railroad employees. And even on the stevedores argument itself, a few things. First, Ms. Saxon is not a stevedore. Mr. Dvoretsky said, if you were a seaman who unloaded, unloaded, if you were a railroad employee who loaded, unloaded, then you would be exempt. Here, she's an airline employee who loads and unloads. And so regardless of what happens with the separate category of stevedores, certainly airline employees who load and unload are no different than seamen or railroad employees. Do you accept the premise, though, that stevedores were separate from seamen in 1925? Not always, Your Honor. And we have two pieces of evidence that they weren't. So the first is this Court, the year after the FAA was passed, interpreted the word seaman in the Jones Act. And what it said is that that includes stevedores. And so we know that at least in some contexts, seamen did include stevedores where it didn't make sense to make a distinction. And we know particularly in this context, if you look at the hearings on the FAA, there are very few mentions of this exemption in the hearings. But one of them is the reason you would include this exemption is to ensure that stevedores in particular are not subject to the FAA. So it seems quite likely that when Congress used the word seaman, it was using it in the same way that this Court understood it to be used in the Jones Act at the time, which is to exclude stevedores. But whether or not stevedores were considered to be seamen, would you say that everybody who works for a shipping company, an ocean liner company, falls within the exemption? Not everybody, but certainly those who do the customary work of the company. So the commonality between seamen and railroad employees is they're both classes of workers. Seamen do the customary work of the shipping industry. That's why they're identified. That's the way in which they're engaged in commerce. Well, no, a lot of people do the customary work of a, what's the word I'm looking for, a maritime company, a company that operates ships besides seamen. So what was the point of putting in seamen if everybody was going to be included? So what seamen and railroad employees both are were commonly understood pre-existing categories of workers. And so Congress identified those categories of workers. They existed in the world. The other reason is that seamen and railroad employees both already had dispute resolution statutes governing them. And so Congress would have been specifically thinking about them at the time. But we know that Congress didn't mean to limit the exemption to people who were seamen or people who were railroad employees because it also exempted any other class of workers engaged in commerce. Who besides executives who works for an airline do you think does not fall within this exemption? Or is there no such, or is everybody other than the executives included? No. So say Southwest, for example, had a credit card points program. I think they maybe do. The people who work for the credit cards point program are not doing the transportation work of Southwest. They're doing something that is at best tenuously connected to that. And so they would not fall within the scope of the exemption. What about a bookkeeper, somebody who schedules cruise? I think somebody who schedules cruise would fall within the exemption. And the reason for that is because that person would have been a railroad employee in 1925. They would have been doing the customary work of the railroad. And so under the test for what counts as a railroad employee that's been in place for 100 years and is now also applied to airline employees, that person would also be exempt. How about the people who design or manage the website for Southwest? I think that's a more difficult question. And I will tell you that this question actually does come up occasionally under the Railway Labor Act today. You know, I am aware of one decision at least that says that that's really integral to the transportation of passengers. And so it's possible that that person is an airline employee. If they are, it's really the outer edge of what's in this exemption. Cargo loaders, on the other hand, are the core of what's at this exemption. And not only do we know that they were railroad employees at the time, we also know that they were engaged in commerce at the time. So we not only have, you know, Mr. Dvoretsky pointed out that Birch is a FILA case, but I want to note that Birch does not articulate new principles in the context of FILA. Birch is relying on, you know, dozens of cases of this court that all held that transportation has already begun once it's in the hands of the carrier and it doesn't end until it's delivered. It's also relying on cases of this court that hold that loading and unloading specifically count. So you have Gloucester Ferry. You have Hayes. You have a number of these cases in a number of different contexts, all of which hold that loading and unloading specifically are people who do that are engaged in commerce. And what Southwest argues is that, well, those cases aren't under this particular statute. But of course they're not. This particular statute didn't exist. But Congress, knowing how this court had interpreted the phrase engaged in interstate commerce, engaged in foreign commerce, nevertheless used those words. And I want to note that, you know, Southwest presents the virtue of its test as a bright-line rule. That's essentially Southwest's argument is that their test is this bright-line rule that will be easily administered. And I think it's worth noting that, in fact, in many cases that's not true. And it's not just a problem in these novel industries like Lyft or Uber, which I will say I don't know how Southwest tests would apply there. Because would it be a percentage of the rides, for example? Would it be a percentage of the people? Would the class of workers be Lyft drivers? Would it be Uber drivers? But even in Heartland classes of workers, Heartland categories of workers on the railroad and the airline, it's difficult to know how to apply Southwest tests. So if you take, for example, loadmasters, that's a really key airline function for freight airlines. And what they do is they balance the load of the airplane so it doesn't fall out of the sky. And sometimes they're at airports and sometimes they ride on the plane. And sometimes the same person does both. Sometimes those different people. It's not clear to me on Southwest tests what the category of workers would be. Would it be all loadmasters? Would it be loadmasters on a plane? Would it be Southwest loadmasters? And it's not clear to me how you would know on their test whether or not as a class those people are on a vessel engaged in crossing state lines, rather. Would it be a percentage? A percentage of each person? And that's true for a number of categories. I haven't just cherry-picked one particular group of workers that's difficult, that's particularly difficult. Particularly on the railroad at the time, there were a number of workers who were on and off the train. Flagmen, for example, people warning of danger. Some worked on the train, some didn't. Baggage handlers. Some worked on the train and some didn't. And so there are a number of categories of workers that actually would be quite difficult under Southwest tests. And I recognize... Could you just say succinctly what your test is? Sure. The test you would recommend that we adopt. Sure. Airline employees, it's the same test that has been in effect in the railroad industry for over 100 years. Airline employees are those who do the work of the airline. They do the customary work directly contributory to the airline's transportation function. And what's the narrower test if we decide to go that route? Sure. So the narrower test would simply be a class of workers that is engaged, would be understood to be engaged in foreign or interstate commerce, which at the very least would be people who handle goods while they're in commerce. So anybody who handles goods while they're in transportation from the start of the transportation when they're given to the carrier to the end. So would your test apply to any company that engages in the shipment or transportation of people or goods across state lines? To what industries would it apply besides the airlines? So it would certainly apply. I can think of two, I think, major industries that are the same, trucking and busing. And I can't think of any other industries. Perhaps space travel will take off and it would apply to that industry. But it really is still a narrow test. What about a company that ships most of its products across state lines? To consumers, let's say. Would it apply to the? So what I would do to answer that question is to look at whether those people would have been engaged in commerce in the same way as railroad employees and seamen at the time. And if you look at in 1925, railroad employees and seamen were really people who worked in industries that shipped goods for the public. So if we're talking about a company that is shipping its own goods, those people likely wouldn't have been railroad employees or seamen at the time. And similarly, those people likely wouldn't be exempt from a statute here. And so really this is still quite a narrow category. Transportation workers is a narrow category of workers. And workers themselves is a narrow category of the transactions to which the FAA applies. What about workers for a company like Amazon or something who are obviously shipping goods across state lines? It doesn't sound like a narrow group to me. Well, so I think the way I would look at that is to look at what they're doing and to see, again, whether that is similar to what seamen and railroad employees did in 1925. They get products and put them in a box and ship them somewhere. That's what they're doing. Sure. So certainly retail warehouse workers in 1925 would not have been seamen or railroad employees. The only warehouse workers that would have been seamen and railroad employees were people who worked for the transportation company itself, who were handling the goods in the warehouse while it was on its journey. So to the extent that's. Well, I mean, I meant to hypothesize people who were handling goods in the warehouse and getting them into interstate transportation. They would not be covered or. So I think it would depend on whether they were, you know, retail warehouse workers, which certainly wouldn't have been covered, wouldn't have been railroad employees or seamen or engaged in that way, or whether they are, you know, workers akin to the railroad workers at the freight warehouse. UPS and FedEx and all those things would be covered. That's right. And those people would have been railroad employees in 1925. There are at least six decisions of the railroad labor board holding that those people do the customary work of the railroad. It was integral to railroad transportation, just as it is to trucking and plane transportation today, that there's a place for the, the packages and the shipments to be dropped off and to, to be stored before they go on their journey. It's integral. You know, it's a place where they they rest in between different legs of their journey. Justice Thomas mentioned intermodal transportation. The freight warehouse was integral to that too. And so certainly to the extent that we're talking about, you know, a warehouse that is in the middle of, of the goods journey that those people would have been railroad employees. How do you distinguish truckings in you say truckings in the exemption? Yes, your Honor. Okay. A company does just like the trucking, but they have other parts and they do their own shipping. That's Amazon. So how, where, where, how does that work? So the way I would address that, not just Amazon, I mean, department stores, dozens. Sure. So, so I think those people are likely not exempt. And here's why there was a, this question came up in 1925. And it usually came up in the form of, is this railroad actually a railroad regulated under the interstate commerce act or the transportation act? And there was a distinction that was made between railroads that shipped things for the public. And I think that's how we normally understood it. Stan Seaman and railroad employees and say a coal's internal, a coal companies, internal railroads or coal companies had a lot of railroads and they would take your coal from the place where you mind it to the place where you refined it. And those were not really understood to be railroads in quite the same way. And I don't think those employees would have understood to be railroad employees. And so we would look at in a company like that is to see, you know, what are those workers doing? Are they really doing the work that is like Seaman and railroad employees of, of shipping goods for the public, or are they really doing their own companies for internal work? And that's how I would analyze that question. I mean, your argument seems to be to shift back and forth. Uh, if we look at, uh, employees who were engaged in interstate and foreign commerce, as we understand those terms today, wow, that includes just about every commercial activity. On the other hand, if we look at Seaman, that's pretty narrow and it may or may not include stevedores. Let's say it, you know, you throw in stevedores. I don't see how it includes the person in the office who sells the ticket. To take the, uh, Queen Mary across the Atlantic. I'm less. So unless that surplus age, uh, working in interstate and foreign commerce has to have a narrower meaning. Uh, I don't think that's right. Your honor, for two reasons. First, it's not surpluses because a circuit city tells us what Seaman and railroad employees are doing is saying the way in which you're engaged in commerce is the transportation branch. Um, and so, and so that serves as a function. If it just said, for example, everybody who worked for the Cunard line was covered, what would be the point of, uh, or it's not a, that's a passenger shipping line, some commercial shipping line. Everybody who worked for that was covered. What would be the point of specifying that Seaman are covered? You, well, a couple of reasons. One, if you only had one category, it'd be actually very difficult to tell what the commonality was. If it just said railroad employees and any other class of workers, I would make it much more difficult to understand, you know, how that category reflected the cat. Other classes of workers were identifying. And this court has repeatedly said that we don't apply a Houston generous. If you only have one category, suppose it said Seaman railroad engineers and others engaged in interstate or foreign commerce, would everybody who worked for the railroad be covered? No. And the, I, or potentially not, that would be a much more difficult question. And the reason is what that would be into that could be indicating to us that we're going job by job here. Instead, we have Seaman and railroad employees, the two classes of workers that had preexisting dispute resolution, um, statutes at the time, uh, and we're pre and we're, we're commonly understood categories. And so, and so the way in which they're engaged in commerce and the way in which they're similar is that there, as a class, the Seaman are the people who do the work of the shipping industry is a class. Railroad employees are people who do the work of the railroad industry. And so if you had railroad engineers, that would shed some doubt on that linkage. And it might suggest that in fact, potentially we're looking for a more job specific approach here. It doesn't say Seaman, you know, flag men, railroad conductors, it's a Seaman and railroad employees. And so we're talking about the classes of workers that are specific to the industry. So we would assume two things for me assume that the term railroad employees does include baggage handlers. So you, in that one, but assume Seaman does not include Steve doors. So Mr. Devere, Deverecki wins that one. And I think he said when this came up, well, then it's one on each side. It doesn't tell you very much of anything. How would, if you make those two assumptions, how should we approach ramp supervisors? So if you make those two assumptions, then what we know is that the commonality between Seaman and railroad employees can not be loading and unloading. That's all that tells us is Seaman excludes Siva doors. And, and what we do know that the commonality is, is that they both do the work of the industry. And so if you look at cargo loaders, they do exactly the same thing. And, and what the statute itself tells us is that the commonality we're looking for is the commerce related commonality. So at the very least, when we're talking about a group of workers who this court had repeatedly said are themselves engaged in commerce, then, then it would. And not only that this court has said they're engaged in commerce or they're engaged in commerce, just in the same way that Seaman are, then we know that at the very least, these people are engaged in the residual clause, even if they're not Seaman or railroad employees. If what we're looking for is a class of workers engaged in commerce, like Seaman, like railroad employees. Well, this court has already answered that question in Puget sound, where it said that Steve doors are engaged in interstate commerce, just like the crew of a ship. I have a historical question. We probably know the answer to in, in 1925, there were alternative dispute resolution mechanisms that Congress had approved for Seaman and railroad workers. Did the railroad workers, one cover anyone who worked for the railroad or was it more limited? And if so, how it was limited by an exactly the way, and exactly the tests we're proposing apply here in railroad labor board decision nine 82, which was cited in new prime. What the railroad labor board said is by railroad employees, what the, what Congress must have meant is people who do the customary work, directly contributory to the operation of the railroad. And we know what that means because we have the railroad labor boards orders saying who was in and who wasn't in that subsequent to that decision. The general council wasn't in it. The general council would not have been. I'm not aware of any order, even discussing that because it was well understood that executives would not have been in it, but we do know that cargo loaders are in it. There are six decisions after that decision saying cargo loaders. We know that, you know, people on the train were in it. We know that people in the yard were, were in, and we know that people in the station were in on the other, who, at least who worked, did the transportation work of the, of the railroad. Yes, your Honor. Justice Kagan's question raises, I guess, an oddity in the statute here, which I think they're going to be oddities no matter what, but which is if semen doesn't include stevedores, but railroad workers does include the people who load and unload that stevedores, nonetheless, in your view, come in through the residual clause. Is that accurate? That's accurate. And we know that Congress didn't mean to limit the exemption to people who actually were steaming or actually were railroad employees, because that's why they included the residual clause. That that's correct. Although it is a little odd to have the semen as a category and then say, actually, that doesn't include everyone who's going to be covered, uh, within the shipping, uh, context, I guess. Potentially. But again, semen and railroad employees were the people who had dispute resolution statutes of the time stevedores did not. And I'll note that stevedores, you know, many stevedores were railroad employees. Again, if you look at the wage orders of the railroad labor board, you'll see stevedores listed there. So another potential reason that stevedores aren't listed is because they're, you know, cross cutting a class of workers. And so that would actually make it difficult to specifically list them. It would be a bit confusing to have listed them. And so for that reason too, it makes perfect sense that Congress, you know, specifically identified the classes that themselves had dispute resolution schemes, um, and left everybody else to the residual clause. And, and I just, to wrap up, I just, you know, want to note that Southwest, um, has offered no evidence, um, at all from any time period, either about what the phrase engaged in interstate commerce means or the phrase seaman or railroad employees means to show that these people who are, um, that these, rather these words are limited to people who are aboard a vessel crossing state lines. Thank you. Thank you, counsel. Justice Thomas, any questions? Uh, no questions. Um, Mr. Chief Justice. Justice Breyer. Justice Lolito. Justice Gorsuch. Justice Kavanaugh. Thank you, counsel. Mr. Dabrowski, uh, rebuttal. Thank you, Mr. Chief Justice. A few points in rebuttal. Um, first of all, Ms. Bennett and I agree, of course, that engaged in foreign or interstate commerce has to mean engaged in the same way as seaman and railroad employees. Um, with respect to seaman, seaman as a class are not those who did the work of the maritime industry. They did a particular function within the maritime industry, but it's incorrect to, to say that the commonality that can be extrapolated to the residual cause is simply doing the work of the industry. Um, with respect to railroad employees, I want to give a few specific examples of how railroad employees were understood at the time more, more narrowly than what Ms. Bennett is suggesting. Um, Justice Gorsuch, you asked about the transportation act, um, under the transportation act, it wasn't all railroad employees. There's a decision from 1922 of the railway labor board in which train dispatchers were excluded from the scope of the transportation act because they had a supervisory role, much like by analogy, ramp agent supervisors have a supervisory role. So even the transportation act did not extend all the way to include everybody who in some way contributed to the work of the railroad. Um, the hours of service act from 1907, um, applied by its terms to persons actually engaged in or connection with the movement of any train. That's consistent with our test having to do with being on the plane or the, or the ship or the train. Um, the Erdman act and the new one act likewise, uh, that was from 19, uh, from 1898, uh, referred to people who served on rail cars. And so railroad employees alongside seamen ought to be understood narrowly in the way that, that we're suggesting with respect to administrability. Our test is clear. Does the class of workers predominantly work on the plane or the train? The way that would translate to the airline industry is that is a distinction between flight crew and ground crew. Flight crew are analogous to seamen ground crew are not. Um, that approach is consistent with circuit city. Uh, it's a, it's a clear rule that will avoid extensive litigation over the scope of the section one exemption. Um, it's also consistent with purpose. Um, Ms. Bennett suggested that the entire trucking industry would be exempt. Of course, there is no federal arbitration regime for the entire trucking, for the entire, for the entire trucking industry. Uh, and so the section one exemption ought not be construed in a way that creates a gaping hole undermining Congress's purposes, uh, in section two. Um, the, the right approach for this court to follow here, I think, is the one that then judge Barrett adopted in Grubhub. Um, her test is that transportation workers are those who are actually engaged in the movement of goods in interstate commerce. Um, it's not enough simply to have a connection to the movement, connection to the movement of the goods. It's not a goods focused inquiry under the statute. The statute under the inquiry, uh, the inquiry under the statute has to do with actually moving the goods. Um, and again, from, from Justice Barrett's opinion, um, the class of workers must themselves be engaged in the channels of foreign or interstate commerce. Um, and in the way that seamen in particular were and that railroad employees properly understood in this context were. Thank you, counsel. The case is submitted.